```
UNITED STATES DISTRICT COURT                    (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
KAITLYN TIKKUN,                       : 05 Civ. 9901 (RJS)(JCF)
                                      :
            Plaintiff,                :    MEMORANDUM
                                      :    AND ORDER
     - against -                      :
                                      :
THE CITY OF NEW YORK, et al.,         :
                                      :
            Defendants.               :
- - - - - - - - - - - - - - - - - - -:
```
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

This action is unique among the many cases arising out of arrests made during the Republican National Convention (the "RNC") in 2004. As in most of the RNC cases, the plaintiff asserts claims of false arrest and violation of her First Amendment rights. However, Kaitlyn Tikkun is a transgender lesbian who also alleges that the City of New York, the New York City Police Department (the "NYPD"), and the New York City Department of Correction have implemented policies and practices that subject transgender individuals to invasive, overly intrusive searches in order to ascertain their genital status, and that certain of the defendants violated her rights by engaging in such conduct when she was arrested. (Second Amended Complaint, ¶¶ 11, 57-59, 91-104, 108).

The current controversy concerns the plaintiff's expert witness, Dean Spade, an Assistant Professor at the Seattle University School of Law. The defendants have moved to preclude the testimony of Professor Spade on the ground that the plaintiff

1

has refused to disclose the information and data upon which this expert witness bases his opinions as required by Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.  The defendants also seek an award of the costs that they incurred in taking Professor Spade's deposition. For the reasons that follow, the defendants' motion is denied.

Background

According to his curriculum vitae, Professor Spade is a graduate of Barnard College and UCLA School of Law.  (Curriculum vitae, attached to Expert Opinion of Dean Spade, Esq. ("Spade Opinion"), attached as Exh. A to Letter of Andrea J. Ritchie dated Oct. 23, 2009 ("Ritchie 10/23/09 Letter")).  He was a founder of the Sylvia Rivera Law Project ("SRLP"), a civil rights organization in Manhattan that focuses on equality for gender nonconforming persons, and served as a staff attorney there from 2002 through 2006.  Prior to joining the faculty at Seattle University School of Law, Professor Spade was a Lecturer at Harvard and Columbia Law Schools and a Teaching Fellow at Harvard and UCLA.  For purposes of this litigation, he characterizes himself as an expert "in the field of administrative policy concerning the treatment of transgender and gender nonconforming individuals in sex segregated facilities."  (Spade Opinion at 1).

In his expert report, Professor Spade offered four opinions. First, he stated that "[i]t is essential for city agencies to

develop and disseminate clear and specific policies addressing the treatment of transgender individuals, particularly in the context of sex segregated facilities." (Spade Opinion at 2). Second, and most pertinent to the instant motion, he contended that "[t]he absence of such policies contributes to widespread violations of the constitutional rights of transgender people." (Spade Opinion at 3). In support of this opinion, Professor Spade related that he had testified before the New York City Equal Opportunity Commission in 2004 that "approximately 58 percent of the cases that I see [at SRLP] daily are cases that involve sex-segregated facilities on one level or another." (Spade Opinion at 3-4). Third, he went on to identify the basic elements of an appropriate policy, and, finally, he opined that the policies of the NYPD in 2004 were inadequate. (Spade Opinion at 4-5). Professor Spade then listed the information that he relied upon in reaching his opinions, including the complaint in this action; several deposition transcripts from this and other actions; NYPD policies, training materials, and internal memoranda in place during 2004; and interviews with members of the New York City Gender Identity Project. (Spade Opinion at 5-6).

In the course of deposing Professor Spade, defendants' counsel inquired about the basis for his opinions:

> Q. [W]hat research have you conducted regarding the frequency with which employees of the

3

Police Department violate -- or, in your opinion, violate laws regarding the treatment of transgender individuals?

    A.  I would consider my research to include literature reviews related to those questions, which include literature reviews of existing news articles; of broader studies, like the Stonewall Report produced by Amnesty International, that interviewed people who've experienced such violations; the data collected over the course of the seven years in the existence of the Sylvia Rivera Law Project, which I have access to through the database of the organization; and my interviews with other service providers and agencies in New York City that collect data about their own clients' experiences; my reading of a variety of reports that have attempted to document the kinds of experiences people have with the Police Department.

    Q. Have you yourself ever performed any sort of a quantitative analysis regarding the frequency with which employees of the Police Department violate the rights, or violate the anti-discrimination laws with regard to transgender prisoners?

    A. My research is primarily qualitative.  My quantitative work is primarily with regard to specific policies.  However, I think that the raw data that I have access to through the SRLP database would be considered a quantitative element of my research that prompted my further work in the area.

    Q. This raw data you discussed, what exactly does that data consist of?

    A. Intake data from every client that has come to that organization seeking legal services about their complaints, their personal needs, and issues.

    Q. When you say that you looked at data regarding the frequency with which New York City Police Department employees allegedly violate rights, it's based on how many times a client has come into and discussed this at the Project?

    A. That's one thing it's based on.  As I had mentioned, there's several other things that also have contributed to it.

    Q. When you say "intake," is this an interview that's conducted of a client with an attorney at the SRLP?

    A. Yes.

           *   *   *

    Q. Are these all interviews that you personally conducted?

    A. No.

    Q. Are they conducted by other attorneys at the Sylvia Rivera Law Project?

    A. Yes.

    Q. When you then look at data concerning those interviews, how do you determine what the allegations were, or what the topic of that complaint was?

    A. The database includes a description of what the client came to the organization to discuss, what allegations were made, the dates on which the conversations occurred, and what happened next in the case with the follow-up coordinator.

    Q. Who enters the information into the database?

    A. The attorney who takes the notes.

    Q. Have you ever personally conducted an interview and entered the information into the database?

    A. Yes.  Prior to -- when I worked there.  I no longer work there.

    Q. When you made this statement, and based it on raw data in the Sylvia Rivera database, was that data for the time period when you worked there, or was this a time period including after you left?

>           *     *     *
>
>      A. I'm aware of the data when I worked there, and I also regularly receive reports from Sylvia Rivera Law Project regarding the types of complaints that come in, and the quantity of different types of legal needs [faced] by that population, as well as with other organizations that I utilize in my research to learn about the types of issues being faced by those clients.
>
>      Q. That data that you mentioned -- all the raw data from the databases, and these updates you've been receiving from the Project -- this all informed this assertion here regarding the frequency with which the New York Police Department employees allegedly violate the rights of transgender individuals?
>
>      A. It's one part of what informed that assertion.

Deposition of Dean Spade dated Sept. 11, 2009 ("Spade Dep.") at 43-44, 46-48).  Counsel for the defendants requested production of the data that Professor Spade referred to, but plaintiff's counsel objected on grounds that the information is protected from disclosure by the attorney-client privilege. (Spade Dep. at 48).

The defendants then submitted a letter motion seeking an order precluding Professor Spade from presenting his expert opinion because the requested information had not been produced.  (Letter of Gerald S. Smith dated Oct. 2, 2009). The parties attempted to negotiate a resolution but were unsuccessful.  During the briefing of the motion, Professor Spade excised from his opinion the reference to his having

testified that a specific percentage of the cases at SRLP involved sex-segregated facilities; otherwise his expert report remains unchanged. (Amended Expert Report of Dean Spade, Esq. ("Amended Expert Report"), attached as Exh. A to Letter of Andrea J. Ritchie dated Dec. 4, 2009).

Discussion

With respect to a witness who is retained to provide expert testimony, Rule 26(a)(2) of the Federal Rules of Civil Procedure provides in pertinent part:

> [Except as] otherwise stipulated or ordered by the court, [a party's expert] disclosure must be accompanied by a written report -- prepared and signed by the witness. . . . The report must contain: (i) a complete statement of all opinions the witness will express and reasons for them; [, and] (ii) the data or other information considered by the witness in forming [the opinions].

The Advisory Committee Notes that accompanied the 1993 amendments to this rule make clear that the disclosure requirement applies to anything that a testifying witness has considered, not merely to that which he or she has relied upon in forming an opinion: "The [expert] report is to disclose the data and other information considered by the expert and any exhibits or charts that summarize or support the expert's opinions." Fed. R. Civ. P. 26(a)(2) Advisory Committee Note to 1993 Amendment; see Pharmacy, Inc. v. American Pharmaceutical Partners, Inc., No. 05 CV 776, 2008 WL 4415263, at *6 (E.D.N.Y. Sept. 24, 2008); Sicurelli v. Jeneric/Pentron

7

Inc., No. 03 CV 4934, 2006 WL 1329709, at *4 (E.D.N.Y. May 16, 2006); Schwab v. Philip Morris USA, Inc., No. 04 CV 1945, 2006 WL 721368, at *2 (E.D.N.Y. March 20, 2006).

Furthermore, the notes also state that:

> Given this obligation of disclosure, litigants should no longer be able to argue that material furnished to their experts to be used in forming their opinions -- whether or not ultimately relied upon by the expert -- are privileged or otherwise protected from disclosure when such persons are testifying or being deposed.

Fed. R. Civ. P. 26(a)(2) Advisory Committee Note to 1993 Amendment.  Thus, for example, the disclosure requirement trumps even "the substantial protection otherwise accorded [attorney] opinion work product under Rule 26(b)(3)." Aniero Concrete Co. v. New York City School Construction Authority, No. 94 Civ. 9111, 2002 WL 257685, at *2 (S.D.N.Y. Feb. 22, 2002); accord In re Pioneer Hi-Bred International, Inc., 238 F.3d 1370, 1375 (Fed. Cir. 2001); Sparks v. Seltzer, No. 05 CV 1061, 2007 WL 295603, at *1-2 (E.D.N.Y. Jan. 29, 2007); Ling Nan Zheng v. Liberty Apparel Co., No. 99 Civ. 9033, 2004 WL 1746772, at *1-3 (S.D.N.Y. Aug. 3, 2004); Herman v. Marine Midland Bank, 207 F.R.D. 26, 28-29 (W.D.N.Y. 2002); United States Fidelity & Guaranty Co. v. Braspetro Oil Services Co., No. 97 Civ. 6124, 2002 WL 15652, at *6 (S.D.N.Y. Jan. 7, 2002).

Here, the defendants contend that these principles

require that all information underlying Professor Spade's opinions be disclosed and that the failure to make such disclosure necessarily mandates preclusion of his testimony.

The interplay between privilege and expert disclosure may be approached from two complementary but distinct perspectives. The first is a waiver analysis: when a party provides an expert with information to consider in connection with offering an opinion, the party forfeits whatever privilege might attach to that information. The Advisory Committee appears to have focused on the waiver concept when it noted that parties could no longer assert privilege for "materials furnished to their experts to be used in forming their opinions." Fed. R. Civ. P. 26(a)(2) Advisory Committee Note to 1993 Amendment. The waiver principle also prohibits counsel from providing their own opinion work product to an expert to shape the expert's views and then attempting to shield that information from discovery. See, e.g., Pioneer, 238 F.3d at 1375 ("Indeed, we are quite unable to perceive what interests would be served by permitting counsel to provide core work product to a testifying expert and then to deny discovery of such material to the opposing party.").

The waiver principle, however, has no role in the analysis of this case, where the plaintiff, Ms. Tikkun, was not responsible for providing the privileged material to

Professor Spade.  Indeed, Professor Spade accumulated knowledge about the nature and incidence of complaints asserted by transgender persons while employed at SRLP, prior to and independent of this litigation.

Apart from the waiver principle, there is a second, broader interest to be served by requiring disclosure even of privileged information, an interest that might be characterized as a fairness principle.  An expert opinion cannot be a "black box," immune from scrutiny by the opposing party, merely because the expert relies exclusively on privileged information in forming his or her opinion.  The fairness principle, however, does not necessarily dictate that every jot of information relied upon by an expert need be disclosed.

It is not inequitable to respect Professor Spade's assertion of privilege and deny the defendants' requested preclusion order in this case.  First, the information at issue is plainly protected by the attorney-client privilege: it consists of communications between SRLP attorneys and the clients who were seeking advice from them.  While not impenetrable, this privilege, unless waived, is carefully guarded by the courts.  See Leviton Manufacturing Co. v. Shanghai Meihao Electric, Inc., 613 F. Supp. 2d 670, 722 n.24 (D. Md. 2009) ("The [attorney-client] privilege remains

10

largely sacrosanct."); Bowling v. Hasbro, Inc., 582 F. Supp. 2d 192, 211 (D.R.I. 2008) ("This Court has an obligation to safeguard the virtually sacrosanct privacy of the attorney-client privilege . . . ."); Southern Scrap Material Co. v. Fleming, No. Civ.A. 01-2554, 2003 WL 21783318, at *1 (E.D. La. July 30, 2003) ("The confidential relationship between lawyer and client is sacrosanct and one of the bastions of [] ordered liberty.").  The calculus might be different if the undisclosed material had instead consisted of work product or confidential commercial information.  See Tribune Co. v. Purcigliotti, No. 93 Civ. 7222, 1997 WL 10924, at *4 (S.D.N.Y. Jan. 10, 1997) (attorney-client privilege more sacrosanct than attorney work product).

Second, the attorney-client communications provided but one basis for Professor Spade's opinions.  He also relied upon secondary reports from SRLP and from other organizations that serve the transgender community, as well as testimony from public hearings.  (Spade Dep. at 47-48, 52, 55-56, 60-61).  To be sure, those reports themselves may ultimately be based on an aggregation of privileged communications, but the defendants have always been free to explore the methodology that any of these groups used to reach the conclusions that Professor Spade relied upon in turn.

Third, the plaintiff here is not seeking to shield from

11

scrutiny any analysis that was done specifically for this case. Professor Spade made his observations independent of this litigation. Similarly, the reports he relies on were created by organizations that have no role in this action. Thus, there can be no presumption that the studies were undertaken with a bias based on any interest in this case, and there is therefore less need to breach the privilege to permit an exhaustive review of the underlying data.

An example may be helpful to illustrate that an expert's reliance on undisclosed privileged material does not necessarily require preclusion of the expert's opinion. Suppose the chief orthopedic surgeon at a major hospital is retained as an expert in a medical malpractice case. He renders an opinion that knee replacements using method A achieve better results than replacements using method B, and he bases this opinion in part on his experience reviewing the charts of hundreds of patients over the course of his career. It is implausible that a court would require disclosure of the confidential patient records or preclude the doctor from testifying if the records were not revealed.

The defendants nevertheless contend that two of my own prior decisions mandate a determination precluding Professor Spade's testimony. First, they rely on American Steamship Owners Mutual Protection and Indemnity Association, Inc. v.

Alcoa Steamship Co., No. 04 Civ. 4309, 2006 WL 212376 (S.D.N.Y. Jan. 26, 2006), where an attorney who had reviewed a relevant attorney-client communication in his former capacity as general counsel for the plaintiff was later retained by the plaintiff as a testifying expert. In requiring disclosure of that communication, I reasoned that

> for purposes of deciding what information an expert has "considered" under Rule 26(a)(2)(B), no bright line can be drawn at the time of the expert's retention. It is unlikely that an expert can cast from his mind knowledge relevant to the issue on which he is asked to opine merely because he has learned it prior to receiving his assignment.

Id. at *2. American Steamship is distinguishable from this case, however, because there the waiver principle alone was a sufficient basis for requiring disclosure: it was the plaintiff who provided the expert with the privileged information, and the plaintiff's subsequent retention of the expert effected a waiver. Here there can be no waiver, since Ms. Tikkun is in no way responsible for Professor Spade's having had access to other people's privileged information.

The defendants also contend that permitting Professor Spade to testify would be inconsistent with an earlier decision in this case in which I precluded the testimony of Z. Gabriel Arkles. (Memorandum Endorsement dated Dec. 3, 2008 ("12/3/08 Memo. End.")). Mr. Arkles, a staff attorney at SRLP, would have testified that roughly a quarter of the

13

approximately 250 clients of SRLP had made allegations of overly intrusive searches in connection with placement in sex-segregated facilities. (Letter of Gerald S. Smith dated Oct. 20, 2008, at 2). I found that "this evidence is only relevant to the extent the testimony is offered for the truth of the matter asserted, i.e., that the complaints are well-founded." (12/3/08 Memo. End.). Since the assertion of privilege deprived the defendants of the opportunity to test that evidence, I precluded it. (12/3/08 Memo. End.). Mr. Arkles, however, was proffered as a fact witness who would have testified about specific data -- information that was withheld from the defendants. By contrast, Professor Spade is an expert who will offer the more general opinion that the absence of clear policies for the treatment of transgender individuals contributes to "widespread" violation of their rights. (Amended Expert Report at 2-3). The defendants have had a fair opportunity to explore the underpinnings of this more impressionistic testimony, even without access to the files of Professor Spade's former clients.

Conclusion

For the reasons set forth above, the defendants' motion to preclude the plaintiff from introducing the expert opinion of Professor Dean Spade is denied, as is their application to shift to the plaintiff the costs of Professor Spade's

14

deposition.

SO ORDERED.

*James C. Francis IV*
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       February 17, 2010

Copies mailed this date:

Andrea J. Ritchie, Esq.
995 President Street
Brooklyn, New York 11225

Gerald S. Smith, Esq.
Senior Corporation Counsel
100 Church Street
New York, New York 10007